Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-09-00430-CV

Charles E. **DURST**, Jr.,
Appellant

v.

**TEXAS MUTUAL INSURANCE COMPANY** and Russell L. Davis,
Appellees

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 07-0551-CV
Honorable W. C. Kirkendall, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:         Sandee Bryan Marion, Justice
                 Phylis J. Speedlin, Justice
                 Marialyn Barnard, Justice

Delivered and Filed: August 25, 2010

AFFIRMED

This appeal involves a workers' compensation "extent of injury" dispute. Charles Durst obtained workers' compensation benefits in a prior proceeding, and then sued Texas Mutual Insurance Company and its adjuster Russell Davis (collectively, "Texas Mutual") for bad faith handling of his claim, asserting Texas Mutual did not have a reasonable basis to dispute his claim of aggravation of a pre-existing back condition. The trial court granted summary judgment in favor

of Texas Mutual on Durst's bad faith claim, and Durst now appeals. We affirm the trial court's judgment.

## BACKGROUND

In November 2004, Durst, a groundskeeper employed by The Bandit Golf Club, injured his back while working. Texas Mutual, the workers' compensation insurer for the Golf Club, did not dispute that Durst sustained a work-related injury, but did dispute the extent of Durst's injury–it disputed the extent to which the injury aggravated Durst's pre-existing degenerative back condition. Texas Mutual began paying Durst temporary income benefits and paying for his medical treatment while it investigated the extent of his compensable injury.

Approximately three months after the accident, Durst sought treatment from an osteopath, Dr. Bret Holland. On January 21, 2005, Dr. Holland completed a workers' compensation form stating that Durst had reached "maximum medical improvement" as of that date, and "does not have any permanent impairment as a result of the compensable injury." Durst then consulted with Dr. Lloyd Youngblood, a spinal surgeon, on January 25, 2005. Dr. Youngblood recommended that Durst undergo two surgical procedures at the same time: (i) a decompression to correct the disc herniations impinging on his nerves and causing back pain; and (ii) a three-level spinal fusion of the L3 through S1 spinal levels to treat his degenerative condition and strengthen his lumbar spine. On February 1, 2005, Dr. Youngblood requested that Texas Mutual pre-authorize the two surgical procedures.

Dr. Nicholas Tsourmas reviewed the pre-authorization request on behalf of Texas Mutual. In a transcribed "peer-to-peer" conversation on February 3, 2005, Dr. Youngblood explained to Dr. Tsourmas why Durst needed the spinal fusion surgery. Dr. Youngblood stated, "The indication for

a fusion is he has motion segment disease, the facets are worn out and the discs are worn out. This man is a laborer." Dr. Tsourmas told Dr. Youngblood he did not believe a spinal fusion was medically necessary, but stated he would approve benefits for the decompression procedure to address Durst's herniations. Dr. Youngblood disagreed, stating he believed it was advisable to do both procedures during the same surgery.

Upon Dr. Youngblood's request for reconsideration of the fusion, another physician, Dr. William C. Watters, III, reviewed the request on behalf of Texas Mutual. After initially denying the pre-authorization request, Dr. Watters later approved the fusion procedure as "medically necessary" on or about March 18, 2005. However, Texas Mutual continued to dispute the compensability of the fusion procedure. *See Zenith Ins. Co. v. Ayala*, No. 09-0292, 2010 WL 2332078, at *2-3 (Tex. June 11, 2010) (per curiam) (explaining the differences among disputes regarding compensability, extent of injury, and preauthorizations based on medical necessity).

The adjuster for Texas Mutual, Russell Davis, ultimately determined that Durst's degenerative back condition, which the fusion was designed to address, was an "ordinary disease of life" unrelated to the workplace accident, and therefore not part of his compensable injury. In its March 24, 2005 formal notice of extent of injury dispute, Texas Mutual stated it was denying "any benefits related to degeneration in the spine," which meant the spinal fusion would not be covered. The denial was based in part on the medical opinion of Dr. Tsourmas, who had reviewed Durst's medical records including his 2005 MRI, and the notes made by Drs. Holland, Youngblood, and Watters. In his March 20, 2005 report, Dr. Tsourmas noted that, "Durst has a degenerative spinal stenosis and an ongoing degenerative disk and facet disease. This is ongoing and in fact progressive and degenerative. How much contribution or proximate cause was the 11/30/04 incident is irresolute

and, at this point, certainly unclear." Dr. Tsourmas concluded that Durst's current symptoms were "more a natural result of an aging process and degenerative process in the lumbar spine," and stated "it is not in Mr. Durst's best medical interest to incur an L3-S1 fusion." Dr. Tsourmas recommended "two to three months more of conservative treatment and possibly . . . a decompressive surgery."

Durst challenged Texas Mutual's extent of injury determination in an administrative proceeding through the Texas Insurance Department's Division of Workers' Compensation (DWC). The DWC benefit review officer ordered Durst to be examined by a neutral doctor. Dr. David Roberts examined Durst and found disc herniations at L3-4 and L4-5, with "some degenerative disc desiccation;" he concluded "these herniations are work related, and would concur with surgical intervention as described by Dr. Youngblood." Upon learning of a previous MRI of Durst's spine taken in 2003, Texas Mutual hired a radiologist, Dr. Lillian W. Orson, to compare the MRIs of Durst's spine taken before and after the workplace accident. Dr. Orson found that the 2003 and 2005 MRIs both showed disc protrusions or extrusions at the same three levels of the spine, with the only change in physical structure being that the extrusion at L4-5 was "more prominent" in 2005; however, she also noted there may be some improvement through a "slight natural partial resorption" of the disc herniation at L3-4, which was the most severe finding on the earlier MRI. Dr. Orson concluded that the larger disc extrusion at L4-5 "could potentially be secondary to the incident," but also noted that "[p]rogression of disc herniations . . . do not necessarily need to be secondary to a specific traumatic event." After a contested case hearing, on November 10, 2005 the DWC hearing officer ruled in Durst's favor, concluding that the opinions of Drs. Holland, Youngblood and Roberts were "more persuasive" than those of Drs. Tsourmas and Orson, and finding that "[t]he compensable injury of November 30, 2004 extends to include the lumbar disc pathology at L3/4, L4/5 and L5/S1."

Texas Mutual appealed the DWC decision on the extent of injury dispute to the DWC Appeals Panel. Texas Mutual requested an independent medical evaluation be performed on Durst, to which Durst agreed. Dr. Charles F. Xeller, an orthopedist, examined Durst and reviewed his medical records, including the 2003 and 2005 MRIs. Dr. Xeller noted that Durst had three bulges in his spine, but no instability. Dr. Xeller compared the two MRIs and reported that, "[t]here may be a slight worsening of his condition from L3 to L5, but I see no acute changes. I have to believe that is degenerative in nature." Dr. Xeller recommended "conservative treatment" and stated surgery was not indicated. Nevertheless, the DWC Appeals Panel affirmed the DWC hearing officer's ruling in favor of Durst on March 13, 2006.

Texas Mutual then appealed the DWC's ruling on Durst's extent of injury to the district court in a judicial review trial. *See* TEX. LAB. CODE ANN. § 410.301(a) (Vernon 2006) (providing for judicial review of compensability determinations); *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 (Tex. 2007) (noting there is a three-step administrative process for disputed claims: a benefit-review conference, a contested-case hearing, and an administrative appeal at which the appealing party bears the burden of proof by a preponderance of the evidence). At the judicial review trial held in September 2007, Dr. Youngblood testified by deposition in support of Durst; Drs. Orson and Tsourmas testified by deposition in support of Texas Mutual's position; and Dr. William E. Blair, Jr., an orthopedic surgeon, testified that the accident may have aggravated only a one-level disc herniation. Following trial, the jury returned a 10:2 verdict in favor of Durst and the trial court entered judgment for Durst. Texas Mutual appealed to this court, and we affirmed the trial court's judgment, holding that Texas Mutual failed to preserve the evidentiary error of which it

complained.  *See Tex. Mut. Ins. Co. v. Durst*, No. 04-07-00862-CV, 2009 WL 490056 (Tex. App.—San Antonio Feb. 25, 2009, no pet.) (mem. op.).

On March 16, 2007, Durst brought a bad faith lawsuit against Texas Mutual and its former adjuster Russell Davis, alleging they violated several provisions of the Insurance Code and the common law duties of good faith and fair dealing by disputing the extent of Durst's injury without a reasonable basis.  Texas Mutual moved for a traditional summary judgment, attaching the affidavit of its adjuster Davis, along with eleven exhibits showing the medical opinions and information he relied on in denying Durst's claim.  Texas Mutual asserted its summary judgment evidence of conflicting medical opinions about the extent of Durst's workplace injury established it had a reasonable basis to deny Durst's claim, thereby negating bad faith liability as a matter of law.  *See Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 194 (Tex. 1998) ("when medical evidence is conflicting, liability is not reasonably clear, and it cannot be said that the insurer had no reasonable basis for denying the claim unless the medical evidence on which the insurer based its denial is unreliable and the insurer knew or should have known that to be the case").  Durst responded with his own summary judgment evidence consisting of twenty-six exhibits, including Dr. Youngblood's notes and records as well as his April 17, 2008 deposition taken in this case; Durst asserted this evidence was sufficient to raise a fact question as to whether Dr. Tsourmas's opinion was a "sham" and Texas Mutual had denied his claim after its liability had become "reasonably clear."  *See State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997) (insurer's denial of claim had no reasonable basis where evidence existed showing expert report relied on by insurer was a pretext or sham).  The trial court denied Texas Mutual's summary judgment motion, finding that the summary judgment evidence raised a fact issue as to whether Dr. Tsourmas's extent of injury opinion was "so

outside the medical norm as to be a sham." Specifically, the court explained, "I believe that the only theory upon which the Plaintiff can avoid summary judgment is if Dr. Tsourmas's opinion is so outside the medical norm as to be a sham and the Defendants knew or should have known that or were reckless in using Dr. Tsourmas. I find that the evidence from Mr. Rogers, Dr. Youngblood and Dr. Holland, as well as the evidence of frequent use of Dr. Tsourmas by Defendant, put that in issue sufficiently to avoid summary judgment."

Texas Mutual then filed a second summary judgment motion and attached affidavits from five physicians in support of Dr. Tsourmas's extent of injury opinion that Durst's degenerative back condition was not aggravated by his workplace accident. The five physicians opined that Dr. Tsourmas's opinion was medically reasonable and was not a "sham." Texas Mutual asserted it was entitled to summary judgment because there was conflicting medical evidence, which was not a pretext or sham, on the extent of Durst's injury. Durst replied, and attached Dr. Youngblood's April 5, 2007 deposition from the judicial review trial as part of his summary judgment evidence; in that deposition Dr. Youngblood stated that Dr. Tsourmas's "dispute of the on-the-job injury to the lower spine and need for surgery" was "not reasonable." After considering the additional summary judgment evidence, the trial court reconsidered the issue and granted summary judgment in favor of Texas Mutual. Durst now appeals the summary judgment in favor of Texas Mutual.

## SUMMARY JUDGMENT

On appeal, Durst asserts the trial court erred in granting summary judgment for Texas Mutual because the insurer failed to conclusively rule out aggravation of Durst's pre-existing back condition by his workplace injury prior to its denial of his claim. Specifically, Durst argues that Texas Mutual was required to establish that Durst's preexisting condition was the "sole cause" of his spinal injury

in order to negate bad faith liability, and asserts the insurer's summary judgment evidence failed to meet that burden. Durst also argues that Texas Mutual's expert, Dr. Tsourmas, had a bias in favor of the insurer, and that such bias rendered his opinion a "sham" which precluded summary judgment in favor of Texas Mutual. Finally, Durst contends the trial court erred in sustaining Texas Mutual's objection to Dr. Youngblood's deposition testimony from the 2007 judicial review trial and excluding it from consideration in ruling on the summary judgment motion.

Texas Mutual responds that summary judgment was appropriate because it presented objective medical evidence, from several sources, showing that it had a reasonable basis to deny coverage for the spinal fusion, and because the evidence of a bona fide "extent of injury" dispute negated Durst's bad faith claim as a matter of law. As to whether Dr. Tsourmas's extent of injury opinion was biased in favor of Texas Mutual, or a "sham," Texas Mutual points to the affidavits from five physicians confirming that Dr. Tsourmas's opinion that Durst's workplace injury did not aggravate his preexisting spinal degeneration was medically reasonable and not a "sham." Therefore, under *Castaneda*, Texas Mutual contends it was entitled to summary judgment on Durst's bad faith claim. *See Castaneda*, 988 S.W.2d at 194.

### Standard of Review

We review the trial court's granting of a summary judgment *de novo. Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We will uphold a summary judgment only if the summary judgment record establishes that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *See* TEX. R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). In deciding whether the summary judgment record establishes the absence of a genuine issue of material fact, we view as true

all evidence favorable to the nonmovant and indulge every reasonable inference, and resolve all doubts in its favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). Summary judgment is "proper if the defendant disproves at least one element of each of the plaintiff's claims." *Am. Tobacco Co.*, 951 S.W.2d at 425.

**Bad Faith – Applicable Law**

A "compensable injury" under the statutory workers' compensation scheme is one that "arises out of and in the course and scope of employment." TEX. LAB. CODE ANN. § 401.011(10) (Vernon Supp. 2009). The term "injury" is defined as "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm." TEX. LAB. CODE ANN. § 401.011(26) (Vernon Supp. 2009). Numerous courts have construed the term "injury" to include aggravation of a pre-existing medical condition. *Kreinik v. Northeast Indep. Sch. Dist.*, No. 04-06-00079-CV, 2007 WL 602606, at *1 (Tex. App.—San Antonio Feb. 28, 2007, no pet.) (mem. op.); *State Office of Risk Mgmt. v. Escalante*, 162 S.W.3d 619, 624 (Tex. App.—El Paso 2005, pet. dism'd); *Peterson v. Cont'l Cas. Co.*, 997 S.W.2d 893, 895 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *Service Lloyds Ins. Co. v. Martin*, 855 S.W.2d 816, 820 (Tex. App.—Dallas 1993, no writ). An "extent of injury" dispute does not address the medical necessity of a particular treatment, but rather focuses on whether a certain condition was caused or aggravated by the compensable injury. *Zenith Ins. Co. v. Ayala*, No. 09-0292, 2010 WL 2332078, at *2 (Tex. June 11, 2010) (per curiam); *State Office of Risk Mgmt. v. Lawton*, 295 S.W.3d 646, 649 (Tex. 2009).

Under Texas law, an insurer has a duty to deal fairly and in good faith with it's insured during the processing of a claim. *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995). An insurer violates its duty of good faith and fair dealing by denying or delaying payment of a claim if the

insurer "knew or should have known that it was reasonably clear that the claim was covered."

*Universe Life Ins. v. Giles*, 950 S.W.2d 48, 49 (Tex. 1997).[1] The critical issue in a bad faith cause

of action is the reasonableness of the insurer's conduct. *Id.* Under the "reasonably clear" standard,

an insurer breaches its duty of good faith when it denies a claim even though its liability has become

reasonably clear. *Id.* at 56; *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).

A bona fide dispute is a sufficient reason for an insurance company's denial of a claim or failure to

make prompt payment. *Simmons*, 963 S.W.2d at 44 (evidence showing only a bona fide coverage

dispute does not establish bad faith); *Nicolau*, 951 S.W.2d at 448.

In *Castaneda*, issued after *Giles*, the Court held that when medical evidence is conflicting

as to coverage, an insurer's dispute of coverage is not bad faith as a matter of law. *Castaneda*, 988

S.W.2d at 194.[2] As long as the insurer has a reasonable basis to deny or delay payment of a claim,

even if that basis is eventually determined to be erroneous, the insurer is not subject to bad faith

liability. *Id.* (evidence showing only a bona fide coverage dispute does not demonstrate that there

was no reasonable basis for denying a claim; likewise, evidence of a coverage dispute is not evidence

that liability under the policy had become reasonably clear); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d

10, 17 (Tex. 1994) (insurer does not breach duty of good faith merely by erroneously denying a

---

[1] In *Giles*, the Supreme Court explained that it was recasting the standard for bad faith liability in positive terms with the use of the "reasonably clear" standard, as opposed to the prior negative formulation in terms of "no reasonable basis," but imposing no new requirements. *Giles*, 950 S.W.2d at 56; *see Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994) (stating the old standard for breach of the duty of good faith as when "the insurer had no reasonable basis for denying or delaying payment of [a] claim, and [the insurer] knew or should have known that fact"); *see also Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988).

[2] In *Castaneda*, the jury instruction was submitted under the pre-*Giles* definition of bad faith; therefore, the court explained its review of the evidence would be guided by caselaw applying the old "no reasonable basis" definition, rather than *Giles*'s "reasonably clear" definition. *Castaneda*, 988 S.W.2d at 193. The court's opinion analyzes the evidence under both definitions of the bad faith standard, recognizing they are simply two ways of stating the same legal standard. *Id.* at 193-94 (stating its conclusion that "there is no evidence that there was no reasonable basis for Provident American's denial of Castaneda's claim . . . or that liability had become reasonably clear . . . .).

claim). Thus, bad faith liability does not exist when there is a genuine fact dispute regarding coverage. *Castaneda*, 988 S.W.2d at 194.

It is well established that an insurer may not, however, insulate itself from bad faith liability by investigating a claim in a manner designed to create a pretext for denial. *Simmons*, 963 S.W.2d at 44; *Nat'l Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373, 376 (Tex. 1994); *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex. 1993). The mere fact that an insurer relies on an expert's report in denying a claim does not necessarily foreclose bad faith liability. *Nicolau*, 951 S.W.2d at 448. Reliance on an expert's report will not shield the insurer from bad faith liability if there is evidence the report was not objectively prepared or the insurer's reliance on the report was unreasonable. *Id.*; *Dominguez*, 873 S.W.2d at 377; *Lyons*, 866 S.W.2d at 601. In *Nicolau*, for example, there was evidence from which a fact finder could logically infer that the expert's reports were not objectively prepared, that State Farm was aware of the expert's lack of objectivity, and that its reliance on the expert's reports was merely pretextual. *Nicolau*, 951 S.W.2d at 448-49 (substantial amount of expert's work, between 80% and 90%, was done for insurance companies, expert had general view that plumbing leaks are unlikely to cause foundation damage, expert's report was based on inadequate information due to unreasonable failure to examine leaking pipe and perform additional tests, accuracy of report was questioned by other experts, and some evidence showed State Farm knew expert report did not justify denying the claim at the time of its denial). Therefore, the court concluded there was some evidence that State Farm denied the claim without a reasonable basis, or without attempting to objectively determine whether its liability was reasonably clear. *Id.* at 448 (concluding there was some evidence to sustain the jury's bad faith finding under either formulation of the standard). The court also noted, however, that an insurer's

mere awareness of an expert's general views and expertise is not, by itself, evidence of bad faith–such evidence may, however, be considered along with any other evidence in the record calling into question the expert's objectivity or reasonableness of his report. *Id.* at 449.

### *Summary Judgment Motions and Evidence*

In its first motion, Texas Mutual moved for a traditional summary judgment based on the affidavit of its adjuster Russell Davis, which it argued established a reasonable basis for the extent of injury dispute, and thus negated Durst's bad faith claim. Davis stated that in reaching his conclusion, he considered and relied on the following exhibits, among others, which were attached to his affidavit:

> (1) the statement by one of Durst's treating physicians, Dr. Bret Holland, that Durst had reached "maximum medical improvement" as of January 21, 2005, and "does not have any permanent impairment as a result of the compensable injury;"
>
> (2) the transcript of a phone conversation between Dr. Youngblood, Durst's spinal surgeon, and Dr. Tsourmas in which Youngblood states he is recommending a three-level fusion because Durst "has motion segment disease, the facets are worn out and the discs are worn out" and Tsourmas states his opinion that Durst does not need a fusion, but rather a decompression of two or three levels;
>
> (3) Dr. Youngblood's January 25, 2005 report stating his initial assessment of Durst as having "lumbar spondylosis with facet arthropathy, lumbar spinal stenosis, degenerative disc disease and disc protrusion or extrusion L3 to S1" and recommending spinal surgery;
>
> (4) Dr. Tsourmas's report dated March 20, 2005 noting Durst's diagnosis is "central spinal stenosis caused by a degenerative lumbar spine," but it is "unclear ... what could and could not be related to the 11/30/04 incident", and opining that Durst's symptoms are not a direct and natural result of the compensable injury but rather "more a natural result of an aging process and degenerative process in the lumbar spine" and disagreeing that a three-level spinal fusion is appropriate for Durst; Dr. Tsourmas's report dated June 1, 2005 reiterating that Durst's degenerative disc condition is a normal disease of life and not directly related to the workplace injury; and Dr. Tsourmas's report dated October 25, 2005 addressing Dr. Orson's comparison of Durst's two MRIs and finding of a new L4-5 disc extrusion of

inconclusive causation and reiteration that spinal fusion is not in Durst's best medical interests;

(5) Dr. David Roberts's report dated July 28, 2005 opining that Durst's disc herniations are work-related and concurring with Dr. Youngblood's recommendation of surgery;

(6) Dr. Lillian Orson's report dated October 13, 2005 comparing Durst's two spinal MRIs and finding a "new larger disc extrusion at L4-5 [which] could potentially be secondary to the incident;"

(7) the TWCC Contested Case Decision and Order dated November 10, 2005 finding "the medical reports of Dr. Holland, Dr. Roberts, and Dr. Youngblood are more persuasive than the reports of the Carrier's doctors" and concluding "the compensable injury of November 30, 2004 extends to include the lumbar disc pathology at L3/4, L4/5 and L5/S1;" and

(8) Dr. Charles Xeller's report of his independent examination of Durst dated December 22, 2005 noting "there may be a slight worsening of his condition from L3 to L5, but I see no acute changes. I have to believe that is degenerative in nature," and recommending conservative treatment without surgery.

Texas Mutual asserted that this evidence of conflicting medical opinions established there was a "reasonable basis" to deny Durst's claim for the fusion surgery, thereby negating bad faith as a matter of law. *See Castaneda*, 988 S.W.2d at 194.

Durst responded, asserting that Texas Mutual had created a pretextual basis for denial of his claim and attacking Dr. Tsourmas's opinion as biased and unreasonable. Durst attached his own summary judgment evidence which included the oral depositions of several doctors, particularly Drs. Youngblood, Holland, Orson, and Tsourmas. As noted, *supra*, the trial court initially found that the summary judgment evidence was sufficient to raise a fact issue as to whether Dr. Tsourmas's opinion was a "sham," and denied Texas Mutual's summary judgment motion.

In its second summary judgment motion, Texas Mutual provided additional medical evidence by submitting affidavits from five independent physicians who swore that Dr. Tsourmas's extent of

injury opinion was within medical norms. Dr. William C. Watters, III, a board-certified orthopedist, stated that, "[i]n no way were Dr. Tsourmas's opinions so outside the medical norm as to be a sham," and opined that Dr. Tsourmas's reports[3] were "medically reasonable." Dr. Watters based his opinion on his review of Dr. Orson's comparison of Durst's two MRIs showing no traumatic change between 2003 and 2005, as well as his "years of experience as a spine surgeon, during which I have gained knowledge that degenerative conditions such as Mr. Durst's are not physically changed by relatively minor trauma such as lifting accidents." Dr. Charles F. Xeller, a board-certified orthopedic surgeon and DWC-designated doctor who personally examined Durst, agreed with Dr. Tsourmas's extent of injury opinion and opined that it was "medically reasonable," and "not so outside the medical norm as to be a sham." Dr. Peter Garcia, a board-certified orthopedic surgeon on the DWC approved doctor list, also stated that Dr. Tsourmas's extent of injury opinion was "medically reasonable" and "within the medical norms both at the time and today." Dr. Garcia agreed with Dr. Tsourmas's opinion that Durst's degenerative condition was not physically changed by his workplace accident, and stated that Dr. Orson's MRI comparison supported that conclusion. Dr. Lillian W. Orson, a board-certified radiologist, compared Durst's 2003 and 2005 MRIs and found no worsening of Durst's degenerative conditions "and certainly no difference in these conditions that can be attributed to an acute injury." Dr. Orson stated that Dr. Tsourmas's extent of injury opinion is not a "sham" and is "entirely consistent with [the] generally held view" that "degenerative conditions such as Mr. Durst's are not generally physically changed by a relatively minor single traumatic event such as a

---

[3] Dr. Tsourmas wrote four reports expressing his opinion on the extent of injury issue: March 20, 2005; June 1, 2005; October 25, 2005; and March 29, 2006. In his last report, Dr. Tsourmas ultimately concluded that Durst had a "pre-existing, multilevel, symptomatic degenerative spine condition which arguably was made worse at one level on one side for a period of time. Non-arguably, it has not permanently aggravated the multilevel degenerative disk and facet changes noted previously."

heavy-object lifting incident." Finally, Dr. William E. Blair, Jr., a board-certified orthopedic surgeon and DWC-designated doctor, stated that Dr. Tsourmas's opinions were "not only medically reasonable, but were in fact correct, and are supported by peer-reviewed medical literature" and are not "so outside the medical norm as to be a sham." Durst responded, attaching, among other evidence, Dr. Youngblood's 2007 deposition testimony from the judicial review case, and sealed payment records of Dr. Tsourmas showing his compensation by Texas Mutual.

The trial court ruled that the additional five affidavits supporting Dr. Tsourmas's opinion as medically reasonable established a reasonable basis for Texas Mutual's denial of Durst's claim which warranted summary judgment in favor of Texas Mutual. In a letter to counsel dated November 14, 2008 explaining its reasoning in granting summary judgment, the trial court stated it applied the following legal principles:

> 1. An insurer breaches it[s] duty of good faith and fair dealing by denying or delaying payment of a claim if the insurer knew or should have known that it was reasonably clear that the claim was covered.
>
> 2. A bona fide dispute does not rise to the level of bad faith.
>
> 3. However an insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial.
>
> 4. Likewise, although reliance on expert opinion can be evidence of good faith, that alone will not necessarily shield the carrier. If the evidence shows that the expert's report was not objectively prepared, that the insurer's reliance on the report was unreasonable or that the expert's opinions are not reliable, sufficient evidence exists to support a bad faith finding.

Acknowledging that its review of the summary judgment evidence was very fact-intensive, the court characterized the main inquiry as whether there was evidence sufficient to raise a fact issue "that the dispute in this case is not 'bona fide.'" The court found no such evidence in the summary judgment

record.[4]   Therefore, the court concluded that Texas Mutual was entitled to summary judgment, having established a reasonable basis for its actions.  The trial court did not rule on the other grounds for summary judgment raised by Texas Mutual.

*Analysis*

On appeal, Durst argues that the trial court erred in granting summary judgment because Texas Mutual relied on Dr. Tsourmas's opinion which was biased and not medically reasonable; therefore, Texas Mutual failed to establish that its dispute and ultimate denial of Durst's claim was a bona fide dispute.  Durst also argues that the summary judgment should be reversed because Texas Mutual failed to prove Durst's pre-existing condition was the "sole cause" of his compensable injury.  Finally, Durst contends the trial court abused its discretion in excluding Dr. Youngblood's deposition testimony from the prior judicial review case.  We address that evidentiary issue first.

### 1. Exclusion of Dr. Youngblood's 2007 Oral Deposition.

As an initial matter, we address Durst's argument that the trial court erred in sustaining Texas Mutual's objection to Dr. Youngblood's deposition testimony from the prior judicial review proceeding.  We apply an abuse of discretion standard in reviewing a trial court's ruling excluding evidence.  *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).  Summary judgment evidence must be admissible under the rules of evidence.  *United Blood Serv. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997).  A court's erroneous exclusion of evidence does not generally warrant reversal unless the appellant shows that the whole case turns on the particular evidence

---

[4] The court sustained Texas Mutual's objections to some of the summary judgment evidence relied on by Durst.  The court excluded Dr. Holland's opinion, finding he was unqualified on the issue of extent of injury.  The court also excluded Dr. Youngblood's 2007 deposition taken in the judicial review case because it did not relate to the extent of injury dispute and was taken in a different suit.  Finally, the court also found that Mr. Peter Rogers, a former DWC hearing officer whose bad-faith opinion was relied on by Durst, was not qualified to render a conclusion regarding the medical aspect of the extent of injury.

excluded. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *Doncaster v. Hernaiz*, 161 S.W.3d 594, 601 (Tex. App.—San Antonio 2005, no pet.).

Here, the trial court ruled that Dr. Youngblood's April 5, 2007 deposition from the judicial review case should be excluded from the summary judgment record because the deposition does not directly address the extent of injury dispute and was taken in a different lawsuit. As to the first reason, the court explained that, in the deposition excerpts relied on by Durst, Dr. Youngblood "is talking about the need for the surgery, not the extent of injury dispute." Our review of the deposition pages cited by Durst confirms the trial court's conclusion. Dr. Youngblood was asked whether in his opinion there was a "reasonable basis for denial of ***treatment*** for your patient?" to which he responded, "Absolutely not." (emphasis added). Youngblood then went on to explain why the ***treatment*** he recommended for Durst, *i.e.*, the fusion, was delayed by the workers' compensation system. (emphasis added). Youngblood was also asked "whether or not the dispute of the on-the-job injury to the lower spine and need for surgery you found in your patient by Dr. Tsourmas was reasonable?" He replied, "In my opinion it was not reasonable . . . It ignored all the medical facts of the case." Read in context, it is clear that these answers by Dr. Youngblood were addressing the denial of his recommended ***treatment***, *i.e.*, the spinal fusion surgery, and did not directly address the extent of injury issue, *i.e.*, whether Durst's back condition warranting the fusion was caused or aggravated by the workplace accident. Indeed, in his deposition, Dr. Youngblood stated, "I don't know if they [Texas Mutual] were questioning whether it was a legitimate on-the-job injury or whether they were questioning my proposed ***treatment***." (emphasis added).

As to the second reason cited by the court, Rule 203.6(b) permits a prior deposition to be used for any purpose in the "same proceeding" in which it was taken. TEX. R. CIV. P. 203.6(b). The

rule defines "same proceeding" as one "involving the same subject matter and the same parties." *Id.* Dr. Youngblood's 2007 deposition was taken in the judicial review case, which addressed only the issue of coverage under the insurance policy and did not involve the issue of whether Texas Mutual breached its duty of good faith in its handling of Durst's claim. Moreover, the adjuster, Russell Davis, was not a party to the judicial review case as required by the rule. TEX. R. CIV. P. 203.6(b). We cannot say the trial court abused its discretion in sustaining the objection to Youngblood's deposition from the judicial review case based on both reasons cited by the court.

### 2. Reasonable Medical Opinion(s) and Bona Fide Dispute

Looking to the summary judgment evidence, and applying *Giles* and *Castaneda*, we must determine whether Texas Mutual proved as a matter of law that it had a bona fide and reasonable basis to dispute and ultimately deny coverage for Durst's fusion surgery. Clearly, the record contains an abundance of differing medical opinions on the extent of injury issue. A total of **seven** doctors evaluated the extent of Durst's injury caused by the workplace accident, and their expert opinions are split on each side of the issue with three experts supporting Durst's position and four experts supporting the reasonableness of Texas Mutual's position at the time of denial. This conflicting medical evidence shows there was a genuine factual dispute regarding the extent of Durst's injury, constituting a bona fide dispute about coverage which negates bad faith liability as a matter of law. *See Castaneda*, 988 S.W.2d at 194; *see also Connolly v. Serv. Lloyds Ins. Co.*, 910 S.W.2d 557, 563 (Tex. App.—Beaumont 1995, no writ) (holding that the carrier established its good faith as a matter of law when summary judgment evidence demonstrated a bona fide controversy regarding the need for back surgery and the carrier relied on a report that surgery was not necessary) (citing *Packer v. Travelers Indem. Co.*, 881 S.W.2d 172, 176 (Tex. App.—Houston [1st Dist.] 1994, no writ));

*Ramirez v. Transcont. Ins. Co.*, 881 S.W.2d 818, 826 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding that an insurer conclusively established a reasonable basis for denying a claim when it relied on an expert's opinion, even though another expert expressed a conflicting opinion).

As the trial court noted, in view of the conflicting medical opinions on each side of the extent of injury issue, the only way Durst could avoid summary judgment was to present sufficient evidence to raise a fact issue as to whether Texas Mutual based its denial of Durst's claim on non-objective, "sham" expert opinion(s). Our final inquiry then is whether Texas Mutual established that its dispute and denial of Durst's claim was bona fide, *i.e.*, not based on an unobjective or "sham" expert opinion.

In the trial court, and on appeal, Durst focuses his argument on Dr. Tsourmas, asserting that his reports were "not objectively prepared," but rather were biased in favor of the insurer, Texas Mutual, with whom he was associated and for whom he often rendered medical opinions. Durst submitted a sealed exhibit showing the monetary amounts that Dr. Tsourmas had received from Texas Mutual. In addition, Durst presented some evidence that Dr. Tsourmas had a general professional view that spinal fusions were not appropriate for conditions like Durst's, and had denied coverage for long spinal fusions in other cases. Durst also relied in part on Russell Davis's affidavit, in which Davis states his knowledge of Dr. Tsourmas as a board-certified orthopedic surgeon who is among a class of surgeons who generally favor conservative treatment and believe that multi-level spinal fusions are sometimes inappropriately performed. Davis also stated, however, that he knew Dr. Tsourmas had approved requests for multi-level spinal fusions in the past. As of March 2005 when Durst's claim was denied, Davis stated he was not aware of "any instances in which Dr. Tsourmas's medical opinions were shown to be false or questionable," and Davis stated he trusted,

and still trusts, the medical judgment of Dr. Tsourmas. Durst also cites to Dr. Youngblood's testimony in his 2008 deposition that he has experience with Dr. Tsourmas denying his prior requests for spinal fusion surgery. Finally, Durst relies on the expert opinions of the physicians who agreed with the spinal fusion treatment of Durst as recommended by Dr. Youngblood. None of those experts, however, stated that Dr. Tsourmas's opinion disagreeing with the fusion was "medically 'unreasonable.'"

The trial court found that Dr. Youngblood's 2008 deposition taken in the instant case "does not directly address the extent of injury dispute . . . instead[,] he regards that as irrelevant and focuses on the need for the 3-level fusion and Dr. Tsourmas' conflicting opinion as to the proper surgery. The one answer he gives regarding the extent of dispute [sic] controversy . . . only says he thought the pre-existing condition was aggravated, not that a contrary opinion was bad faith or outside the medical norm." The court further noted that the evidence showing the sums of money paid to Dr. Tsourmas by Texas Mutual for various services was not by itself a basis for submission of a bad faith issue to a jury. Therefore, the trial court ruled that Texas Mutual was entitled to summary judgment because it had established a reasonable basis for its actions, thereby negating any bad faith liability.

On appeal, Durst relies heavily on *Nicolau*, in which there was some evidence that the primary expert's report was a sham. *See Nicolau*, 951 S.W.2d at 448 (some evidence existed that insurer had no reasonable basis to deny the claim because the insurer relied on an expert report it knew was not objectively prepared). The instant case is distinguishable from *Nicolau*. Looking at the summary judgment record, we agree with the trial court that there is no evidence that Dr. Tsourmas's extent of injury opinion was not medically reasonable or was a "sham." Dr. Youngblood never stated that Dr. Tsourmas's extent of injury opinion was "not medically reasonable" or that it

was a "sham"—only that he disagreed with it. As for the evidence of Dr. Tsourmas's prior denials of coverage for spinal fusions and general view that fusions are often inappropriate, the Supreme Court recognized in *Nicolau* that an insurer's mere awareness of an expert's general views and expertise on a subject does not, by itself, constitute evidence of bad faith. *See Nicolau*, 951 S.W.2d at 449 (insurer's mere awareness of expert's general views and expertise on an issue is not alone sufficient to show bad faith, but may be considered along with any other evidence showing expert's lack of objectivity).

Further, unlike in *Nicolau*, Texas Mutual presented the affidavits of five independent physicians stating that Dr. Tsourmas's extent of injury opinion was medically reasonable, well within medical norms, and "not a sham." Durst never argued, or provided any evidence stating, that the five expert affidavits supporting Dr. Tsourmas's opinion, on which Texas Mutual partly based its denial of Durst's claim, were "medically unreasonable" or "sham" opinions. Durst only attacked the medical reasonableness of Dr. Tsourmas's opinion. The affidavits from the five independent physicians submitted by Texas Mutual all affirmatively and unequivocally stated that Dr. Tsourmas's extent of injury opinion was medically reasonable. Moreover, the affidavits of the five doctors were not controverted by Durst; no fact issue was raised as to the medical reasonableness or reliability of the five doctors' opinions. These five affidavits established that Dr. Tsourmas's opinion was not a "sham" opinion on which an insurer could not rely in good faith. *See Castaneda*, 988 S.W.2d at 194.

Here, as in *Castaneda*, there is no evidence that any of the information relied on by the insurance company in denying coverage was "not objectively prepared" or that reliance on the information was unreasonable. *Id.* The trial court correctly ruled that the five affidavits supporting Dr. Tsourmas's opinion as medically reasonable established there was a reasonable basis for Texas

Mutual's denial of Durst's claim. *See Simmons*, 963 S.W.2d at 44 (bona fide dispute does not rise to level of bad faith).

Finally, Durst asserts that Texas Mutual presented no summary judgment evidence that Durst's injuries were solely attributable to his pre-existing degenerative condition at the time it denied compensability. Durst contends that to defeat coverage in an extent of injury dispute, the insurer must prove the pre-existing condition was "the sole cause of the present disability or incapacity." *See Tex. Mut. Ins. Co. v. Morris*, 287 S.W.3d 401, 417 (Tex. App.—Houston [14th Dist.] 2009, pet. filed) (citing *Tex. Employers' Ins. Ass'n v. Page*, 553 S.W.2d 98, 100 (Tex. 1977)). We disagree that this is the proper standard to be applied in this case. In *Morris* and *Page*, the insurer contended the employee's workplace injury at issue resulted solely from a pre-existing condition. *See Page*, 553 S.W.2d at 100 (where security guard's knee "buckled" as he walked across bank parking lot, evidence presented a fact issue as to whether his present incapacity originated out of his employment or whether his pre-existing knee condition was the "sole cause" of his incapacity); *see also Morris*, 287 S.W.3d at 415-18 (issue was whether employee's prior unrelated back strain in 1998 was the "sole cause" of his present disability requiring back surgery). That is not the case here. Texas Mutual did not dispute that Durst suffered a compensable injury during the course and scope of his employment. The disputed issue here was the degree to which that compensable injury aggravated Durst's admittedly pre-existing degenerative back condition. Accordingly, the "sole cause" principle cited by Durst does not apply in this case.

**CONCLUSION**

Based on the foregoing reasons, we affirm the trial court's judgment. Because we affirm the summary judgment on the ground that bad faith liability was negated as a matter of law, we need not address the other alternative grounds for summary judgment raised by Texas Mutual.


Phylis J. Speedlin, Justice